Filed 12/18/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| THE PEOPLE, | B319020 |
| --- | --- |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA482366 |
| v. | |
| JOSE DIAZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lynn M. Hobbs, Judge. Remanded with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Mark A. Kohm and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jose Diaz shot a street vendor to death for selling on someone else's turf. Diaz appeals his conviction for first-degree murder. He claims police lacked probable cause to arrest him.

But during a surveillance, police spotted Diaz and his distinctive neck tattoo in an incriminating place at an incriminating time, which supplied ample probable cause. Diaz also argues, incorrectly, that the prosecutor committed misconduct by sandbagging his closing argument. Other arguments fail as well, but Diaz does raise sentencing issues with more success. We remand for the trial court to consider whether *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) and Senate Bill No. 81 (2021-2022 Reg. Sess.) (SB 81) have any bearing on Diaz's sentence. We otherwise affirm. Statutory citations are to the Penal Code.

## I

We recount the facts in favor of the prevailing trial party.

## A

William Garcia, age 22, worked at a taco stand. On October 24, 2019, Garcia and his co-worker Joachin Tomas Gonzalez set up their stand on a public sidewalk. A black pickup came to the curb. A man later identified as Diaz got out of the passenger side and said they "couldn't be there, that someone else was paying for that spot." Diaz left in the pickup.

The next day Garcia and Gonzalez tried a different location but made less money. The day after that, on October 26, 2019, the pair set up where Diaz told them not to be. Diaz appeared on foot, knocked over their table, and said "You didn't get it, did you?"

Diaz drew a gun and pulled its trigger but it did not fire. He drew another gun and fatally shot Garcia. Diaz left in the same pickup as before.

Gonzalez told police the shooter was a Hispanic man with a neck tattoo. This tattoo was of a blue flower with a red center, on

the right side of the neck.  A detective said Gonzalez told her "it looked like a flower, maybe a rose."

Gonzalez also said the shooter had black shaved hair and brown eyes, was 5 foot 8 to 5 foot 10 and 30-36 years of age, with a medium build and a dark complexion.  Diaz's driver license lists his hair as black, eyes as brown, height as 5 foot 9 inches, weight as 180 pounds, and birth date as July 27, 1982.  Diaz was 37 when he shot Garcia.

Gonzalez worked with a police sketch artist to create the shooter's image, which Gonzalez did not think was a good likeness of the killer.  The sketch showed a flower tattoo on the right side of the man's neck.  Police included this sketch in a one-page crime alert.

B

Witnesses heard the shot and saw someone enter the passenger side of a black pickup some distance from Garcia's stand.  A dash camera recorded the pickup's license plate, which identified Felix Toco as the pickup's owner.  Police went to Toco's residence at 117 South Fresno Street, but found no pickup.  They did find Toco's employees, who said he ran taco stands in Los Angeles.  These employees said Toco had them prepare food for his stands at his warehouse on 3144 First Street, adjacent to Toco's house.

Police knew two people had been in the pickup, so they had two suspects at large:  Toco and a nameless man.  One had the flower tattoo on his neck.  Police suspected a close relationship between the two.

Police got warrants to search Toco's home and warehouse and to arrest Toco.  In the morning of October 31, 2019, some 20 officers began watching the warehouse and home on the

3

southwest corner of Fresno Street and First Street. This surveillance team hoped to arrest Toco and to search both places.

After about four hours, a man walked past one of the surveillance cars to Toco's warehouse gate, where he spoke with Toco's workers. Team members saw a large flower tattoo on the right side of this man's neck. They arrested him and found he was Jose Diaz. They put his photo in a six-pack array and showed it to Gonzalez, who identified Diaz.

C

Toco considered the public street corner in question to be a taco stand location he owned. Toco's business involved preparing taco ingredients at his warehouse. His crews then would drive the ingredients to Los Angeles locations where they would set up stands. Toco's home and warehouse were about a 15- or 20-minute drive from the murder scene.

Witness interviews, video footage, and mobile telephone records allowed police to reconstruct events of the two key dates: the warning day of October 24, 2019, and the murder day of October 26, 2019.

On the warning day, Toco learned from employees a business rival had set up a taco stand on the corner where Garcia was. This spot was profitable: a prize location. Toco contacted Diaz, who lived a few houses from Toco's warehouse and from Toco's house. In his pickup, Toco drove Diaz to the corner where Garcia and Gonzalez were selling tacos. Diaz got out, told the two not to sell tacos there, and left with Toco.

Two days later, on the day of the murder, Garcia and Gonzalez returned to that corner. Phone records and videos showed Toco again contacting Diaz and driving him to the corner. Toco parked a distance away. Diaz walked to Garcia, shot him,

4

and returned to Toco's pickup.  Toco drove Diaz back to their neighborhood.  A video showed Toco giving Diaz money.

D

Prosecutors charged Diaz with first degree murder.  Toco is not involved with this appeal.

Before his preliminary hearing, Diaz moved for a ruling that police arrested him without probable cause.  The court heard this motion at the same time it conducted the preliminary hearing.  After hearing the evidence, the court denied this motion, citing "the distinctiveness and the location of the tattoo on his neck."

Diaz appealed the denial of his suppression motion to the trial court.  He offered evidence 93% of the population in that neighborhood is Hispanic.  ~(2CT 340)~  The court took testimony.  This court also denied Diaz's motion and ruled police had probable cause to arrest Diaz.

This second court made findings about the crime alert the arresting officers had seen, which included the sketch artist's rendering.  The court stated the flower pictured on the neck in the crime alert sketch "appears to be a computer-generated type of rose.  It doesn't even seem like a drawing of a rose; rather, it appears to be kind of like an icon that's placed on the neck."

Regarding the description as a "male Hispanic," the court found "in that area of our city . . . that is somewhat of a nondescriptor. . . .  [H]undreds of thousands of people" would meet that description.

The court found that Diaz's neck tattoo "is unique.  Judge Sullivan [who first ruled on the motion to suppress] found it to be unique; th[is] court finds it to be unique."  "[T]he description of what the court sees on his neck matches distinctively with what

5

the victim described at the time, it being a blue flower—it could have been a rose—but a blue flower, blue ink. . . . I note[d] the redness one day that I was looking at it and one of the photos shows it as well, there's redness to his neck. That could be why the witness also describes the color red to it—at least in the photo there's shown redness on his neck. The court finds that that too is distinctive." "[T]his court does find that tattoo is unique and was described in a pattern that can be relied upon."

The court added that another identifying feature was "the defendant being seen near the location of the search warrant during the time they're having a surveillance. . . . The property that was being surveilled was [Diaz's] actual location." The police surveillance was at Fresno and First Street in Los Angeles, which was the location of Toco's home and warehouse.

The court concluded police had probable cause and denied the appeal of his suppression motion.

At trial, Gonzalez identified Diaz as the shooter. Witnesses described how police discovered Toco's license plate number, which eventually led them to Diaz. The prosecution played videos showing how Toco and Diaz worked together on both days, and how Toco then paid Diaz in cash. Phone records corroborated their joint action. After two hours of deliberation, the jury convicted Diaz of first-degree murder.

## II

Diaz's appellate arguments are unavailing, except for two points about the gun enhancement to his sentence.

## A

Diaz argues police lacked probable cause to arrest him. The probable cause, however, was ample.

6

Constitutional law requires probable cause for arrests.  The essence of probable cause is a reasonable belief of criminal guilt that is particular to the arrested person.  This standard is practical rather than technical; it deals with the factual aspects of everyday life on which reasonable and prudent people act.  One need not be a legal technician to grasp the concept.  (*Maryland v. Pringle* (2003) 540 U.S. 366, 370–371 (*Pringle*).)

To determine whether officers had probable cause for an arrest, we examine the events leading up to the arrest and decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause.  It depends on the totality of the circumstances.  As the name implies, probable cause deals with probabilities.  It requires only a probability or substantial chance of criminal activity, not an actual showing of a crime.  Probable cause is not a high bar.  (*District of Columbia v. Wesby* (2018) 583 U.S. 48, 56-57.)

The standard is flexible and easy to apply.  (*Illinois v. Gates* (1983) 462 U.S. 213, 238–239.)  The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.  (*Illinois v. Wardlow* (2000) 528 U.S. 119, 125.)

These standards are federal.  California state law must adhere to them.  (*People v. Souza* (1994) 9 Cal.4th 224, 232–233.)

We defer to the trial court's express and implied factual findings if substantial evidence supports them.  Based on those facts, we independently determine the legality of an arrest.  (See *People v. Tully* (2012) 54 Cal.4th 952, 979.)

The trial court found Diaz's neck tattoo was "unique."  Diaz has not controverted this factual finding.  Rather, he has conceded "he does have a quite distinct tattoo; there's no denying

7

that."  Elsewhere Diaz's counsel wrote Diaz "does not deny that he has a distinctive tattoo on his neck."  Nor has Diaz suggested that, while the design of *his* particular flower tattoo is distinctive, it is common for men to have *some* kind of flower tattoo on their necks.  As a factual matter, then, the presence of *any* kind of flower tattoo on a man's neck was, on this record, highly distinctive.  This accords with common experience.

Police had probable cause to arrest Diaz.  They had a location connected with the murder, thanks to the license plate.  They went to the suspect location as soon as they could get warrants. Nearly immediately, Diaz and his highly distinctive neck tattoo showed up.  The confluence of three independent factors—right place plus right time plus a highly distinctive personal feature—vastly increased the probability police found a guilty man.  There was probable cause.

Diaz's contrary arguments are unsuccessful.

Diaz argues the general description of a Hispanic male of average height and build match the physical characteristics of most men in the neighborhood where he was arrested.  This argument ignores what was distinctive—the neck tattoo—and focuses on what was not.

As for the tattoo, Diaz asserts this was not so distinctive as to provide a reasonable person with a strong suspicion that Diaz had committed the homicide.  This assertion is incorrect, because a man with a unique or highly distinctive feature who appears in the right place at the right time does trigger a reasonable conclusion that police located the man guilty of the shooting.  It may not be proof beyond a reasonable doubt, but that standard has no place in probable cause determinations.  (*Pringle, supra,* 540 U.S. at p. 371.)

8

Diaz also argues there was no probable cause because Diaz's tattoo had no red in it and police had a description of a tattoo of a blue flower "with possibly a red center." The trial court found as facts that Diaz's tattoo was in blue ink and there was "redness on his neck." More generally, this argument assumes blue flower neck tattoos are common on men, and the only thing distinctive about this witness description was the redness in the tattoo. No record facts support this odd assumption.

Diaz's argument about the size of the flower tattoo also fails. He describes his tattoo as "quite large and distinctive, covering the entire right side of his neck . . . ." Gonzalez, however, did not describe the shooter's flower tattoo as small. Nor was there a factual showing that many men have small flowers tattooed on their necks and the unusual thing about Diaz's flower tattoo was its large size.

Diaz's case citations do not apply to this situation. All involved generic descriptions. None dealt with a person with a highly distinctive feature who was in the right place at the right time. (See *People v. Harris* (1975) 15 Cal.3d 384, 387; *People v. Curtis* (1969) 70 Cal.2d 347, 350, 358; *People v. Mickelson* (1963) 59 Cal.2d 448, 452–454; *In re Dung T.* (1984) 160 Cal.App.3d 697, 712–718; *People v. Jorge S.* (1977) 74 Cal.App.3d 852, 854–858.)

In sum, probable cause supported this legitimate arrest.

B

Diaz argues the prosecution committed misconduct in its closing argument. The misconduct Diaz alleges is sandbagging: waiting until the prosecution's rebuttal to attack Kathy Pezdek, who was Diaz's expert on eyewitness identification. Diaz did not object at trial and forfeited this argument.

In any event, there was no sandbagging and no misconduct.

The prosecution's opening argument at the conclusion of trial was thorough and reasonably lengthy. We detail these points.

This argument was thorough. It began by explaining to the jurors their role and the burden on the prosecution. The argument then set out the elements of the offense and the proof that satisfied each element. The argument reviewed how the evidence revealed the progression of events on the two days in question. The prosecutor played two videotapes to assist this presentation. He read from jury instructions and discussed reasons why, in his view, the jurors should accept Gonzalez's identification of Diaz as reliable. He explained how other evidence corroborated Gonzalez's testimony.

This argument was reasonably lengthy. It began on page 3001 of the reporters' transcript and concluded on page 3018. The transcript does not reveal the duration of the videotapes the prosecutor played.

Diaz's closing argument began on page 3018 and concluded on page 3033. This defense attorney explained the concept of reasonable doubt and pointed out weaknesses in the prosecution's case, including the arguable inconsistencies in Gonzalez's description and identification of Diaz. Diaz's counsel referred to Pezdek's testimony about factors that can render identifications more and less reliable. The defense argument extensively contended Gonzalez was not confident about his identification of Diaz.

The prosecutor's rebuttal argument began at page 3035 and ended on page 3045. The prosecutor told the jury his second argument would be "just a response to things I heard from

10

[defense counsel].  A lot of the things [the defense] was talking about are a lot of the things that Dr. [Pezdek] was talking about." The prosecutor's second argument sought to establish that Pezdek's testimony generally supported rather than undermined Gonzalez's identification.  The prosecutor ended by playing a video that he said showed Toco giving Diaz cash for killing Garcia.

There was nothing wrong with either phase of the prosecutor's closing argument.  Prosecutors have no obligation to discuss every defense witness in their opening argument.  They may stick to proof of guilt and aim to be concise.  In public speaking, longer does not mean better.

Diaz bases his sandbagging argument on *People v. Robinson* (1995) 31 Cal.App.4th 494, 505 (*Robinson*), which is a curious precedent that has no application here.  The prosecution in that case was badly flawed.  (1)  The prosecutor withheld exculpatory evidence, (2) the trial court wrongly excluded defense evidence, and (3) the prosecutor improperly disclosed to the jury that the defendant was in custody.  (*Id.* at pp. 498–505.)

At the end of a lengthy opinion, the court devoted merely three sentences to a fourth topic:  "[A statute] permits the prosecutor to open the argument and to close the argument.  It does not permit the prosecutor to give a perfunctory (three and one-half reporter transcript pages) opening argument designed to preclude effective defense reply, and then give a 'rebuttal' argument—immune from defense reply—ten times longer (35 reporter transcript pages) than his opening argument.  [Citations omitted.]  That is what occurred here."  (*Robinson*, *supra*, 31 Cal.App.4th at p. 505.)  The court concluded this was prosecutorial misconduct.

11

This holding has not won universal acclaim. (See *United States v. Baca* (D.N.M. 2019) 409 F.Supp.3d 1169, 1261 [*Robinson* created "an arbitrary rule" that the court "does not find persuasive"].)

We distinguish *Robinson*. Diaz's prosecutor gave neither a perfunctory opening argument nor a rebuttal argument that was ten times longer. This case is unlike *Robinson*. There was no sandbagging.

## C

Diaz contends his trial counsel was ineffective because she did not request CALCRIM No. 522, which is about provocation. But a provocation defense was contrary to Diaz's trial theory, which was misidentification. A provocation defense makes sense only if there was *no* misidentification. It was not ineffective assistance for Diaz's trial lawyer to fail to request a jury instruction that clashed with her effort to persuade the jury Diaz had nothing to do with Garcia's murder.

As is relevant, the CALCRIM No. 522 instruction states:

*522 Provocation: Effect on Degree of Murder*

*Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.*

A satisfactory explanation exists for Diaz's trial lawyer's decision not to present a provocation defense and not to request a provocation instruction. To be provoked, a person had to be on the scene. Diaz's defense was he was *not* on the scene. It is possible to argue in the alternative, but to do so risks incredulity from jurors. Moreover, the only evidence of provocation in the

12

record was that Garcia had defied Diaz's order to stay away from a public street corner for which someone else was paying. Diaz's attorney sensibly steered clear of that argument, which would ask the jury to agree that defiance of an extortionate enforcer's demand was mitigating—a request that could spark jury indignation. We reject Diaz's claim of ineffective assistance. (See *People v. Stewart* (2004) 33 Cal.4th 425, 459.)

D

Diaz faults the trial court for giving a jury instruction about witness *certainty* in assessing eyewitness identification testimony. Assuming error, giving this instruction was harmless under any standard. Diaz used the substance of the instruction to his benefit. Eliminating the challenged instruction could not have decreased the likelihood of conviction.

The pertinent eyewitness identification evidence was from Gonzalez, who picked Diaz's picture out of a six-pack photo spread. Police videoed Gonzalez's response to the six-pack. The parties edited this video and its corresponding transcript, and the jury viewed the video and transcript. At the close of trial, the court instructed the jury on factors to consider when assessing an eyewitness identification. Diaz now attacks one sentence within this lengthy instruction.

In particular, Diaz faults the trial court for using CALCRIM No. 315 without taking account of the Supreme Court's decision in *People v. Lemcke* (2021) 11 Cal.5th 644, 661–669 (*Lemcke*). The high court decided *Lemcke* about six months before the trial court read CALCRIM No. 315 to Diaz's jury. *Lemcke* criticized the version of this instruction the trial court used. No one in Diaz's trial displayed any awareness of *Lemcke*.

13

We italicize the key sentence in the trial court's jury instruction.

"As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions: Did the witness know, or have contact with the defendant before the event? How well could the witness see the perpetrator? And what were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation? How closely was the witness paying attention? Was the witness under stress when he or she made the observation? Did the witness give a description? And how does that description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? Was the witness asked to pick the perpetrator out of a group? Did the witness ever fail to identify the defendant? Did the witness ever change his or her mind about the identification? *How certain was the witness when he or she made an identification?* Are the witnesses and the defendant of different races? Were there any other circumstances affecting a witness's ability to make an accurate identification?"

Diaz consented to this instruction at trial. In its trial brief, the prosecution requested 46 standard jury instructions, including CALCRIM No. 315. Diaz did not file a trial brief.

In an informal session before argument, the court and counsel went through jury instructions to identify any controversy. The court named by number the many instructions it proposed giving, including CALCRIM No. 315. The court inquired, "Does anyone have any objections? I didn't hear any." Diaz's counsel asked about three specific instructions not at issue

14

in this appeal. The court and the parties resolved these issues. After this resolution, the court told the defense, "I didn't hear any objections from you or the People, so those will be the instructions I give." Without further comment or discussion, the court and the parties moved on to a different topic. That concluded the trial discussion of which jury instructions the court would give.

In sum, the court named the pertinent jury instruction— CALCRIM No. 315—and invited comment on it and on the other named instructions. Diaz objected to other instructions and said nothing about CALCRIM No. 315. This interchange constituted defense consent to CALCRIM No. 315.

Diaz nonetheless argues the *Lemcke* decision effectively invalidated the italicized sentence by inviting the CALCRIM committee to reevaluate it and by forbidding trial courts from using this sentence until the committee finished its work. (See *Lemcke*, *supra*, 11 Cal.5th at pp. 661-669; but see *id*. at p. 669 & n. 19 [trial courts retain discretion to include this sentence at defense request].)

The problem for Diaz is that he intentionally employed the content of the very sentence he now condemns as a trial defense. The disputed sentence invites jurors, when evaluating the reliability of witness identification of a person, to consider whether the witness was certain. That is what Diaz was urging jurors to do.

The standard of review does not matter because Diaz's argument fails them all. Diaz cannot have told jurors that "certainty matters" and then say on appeal that to say "certainty matters" was a *harmful* error. Eliminating this instruction could

15

not have improved Diaz's trial chances, for the substance of that instruction was his defense.

Diaz's counsel took affirmative actions at trial for a clear tactical purpose. Her trial argument was that Gonzalez's identification of Diaz, when examined closely, was hesitant: *Gonzalez was not certain whether Diaz was the shooter*. Diaz's attorney argued this hesitancy created reasonable doubt, which dictated acquittal.

Diaz's trial attorney mounted this underconfidence defense in a professional and intentional manner. She (1) explained this defense *to the court*, (2) supported the defense with *evidence*, and (3) argued the defense in *closing*. We demonstrate these three instances of intentional attorney conduct, which establish any error could not have harmed Diaz.

*First, to the court*, the defense attorney explained the underconfidence defense. The court and counsel were discussing which portions of Gonzalez's transcript and video to redact. For example, all sides agreed to cut Gonzalez's comment that he thought the shooter was "a gangster." In this video and transcript, police instructed Gonzalez how to view the six-pack they were about to show him. They showed Gonzalez the photographic lineup and Gonzalez pointed to Diaz's picture. Then police asked him to circle the picture he selected. The court asked Diaz's lawyer why she wanted to include a certain portion of the tape and transcript. With our italics, she responded: "The reason I want that is because there was *substantial hesitancy* by Mr. [Gonzalez] on his identification [of Diaz]. He did select my client, but then *he backtracked* from it. There's a lot of back-and-forth dialog, and questions he asked about the six-pack, for example."

16

*Second*, Diaz founded this underconfidence defense *in evidence.* The defense called psychologist Pezdek to testify research showed eyewitness identification can be highly unreliable. Pezdek identified factors that can make eyewitness identifications more and less prone to error.

With our italics, Diaz's counsel asked Pezdek whether there is "any relationship between someone's *confidence* in their identification, and the actual accuracy of their identification?"

Pezdek answered, "Yes."

Pezdek continued, with our italics: "Of the people who choose someone from the photographic lineup, the more confident witnesses are, the more likely they are to be correct, and *the less confident witnesses are . . . the less likely they are to be correct. So if someone is not sure*; 'I don't know,' 'I can't tell you,' 'this is hard,' something like that, but yet they made a selection anyway, *they are less likely to have picked the right person, they are more likely to have made a misidentification. So witnesses who aren't very confident tend to not be very accurate. Witnesses who tend to be very confident tend to be more accurate.*"

*Third*, Diaz elaborated the underconfidence defense to the jury *in closing argument.* Diaz's counsel did not refer to any specific jury instructions in closing, but rather stated generally "I'm going to talk about the facts and try to link them with some legal rules that we have for you to consider when you are deliberating."

Diaz's attorney argued Pezdek's testimony showed the witness identification of Diaz was not reliable. Defense counsel maintained Gonzalez lacked confidence in his selection of Diaz's picture. The defense conclusion was Gonzalez's doubt made his identification of Diaz unreliable. Diaz's counsel went to some

17

lengths to argue Gonzalez had been uncertain. The argument was that Gonzalez said one thing but did another: he said he was certain, but he acted like he was not.

Diaz's attorney began by conceding how, when police showed Gonzalez the photo array, Gonzalez picked Diaz's photo "quite emphatically."

But then, Gonzalez immediately contradicted this certainty by seeming to balk. Police asked Gonzalez to circle Diaz's picture, but Gonzalez "didn't do that. He picked [the photo array] up. He looked some more, and [Gonzalez] said, 'Where did you get the picture? Are these recent? Or is that an old picture?' "

Defense counsel continued, with our italics: "That's not a sign of confidence, okay? He looks at it again, and it's in the transcript as well, page 16, he says again, 'When did you get this picture?' *He's not being confident about his ID.* And I understand that he says that [he is confident] to him multiple times, but he also does multiple things that suggests *he's not confident* of his identification, particularly, when he says, 'Are these people all the same person?' Now, he's already picked Mr. Diaz, No. 3, and then several minutes later he's still questioning whether these are all the same person. *That's not a confident and solid identification.* And it doesn't matter that he eventually confirmed his ID. It's clear from the context of what he says that he isn't -- *he isn't confident.*"

Defense counsel argued jurors should find reasonable doubt because Gonzalez "*had doubts* about [his identification of Diaz] *and expressed doubts* about it while [making the six-pack identification], as well as the scientific evidence presented about what the considerations [about evaluating eyewitness identifications] should be."

18

In short, Diaz used the challenged instruction to his benefit. Removing that instruction could not have helped him. Assuming there was error, it was harmless by any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

E

Diaz protests his 75 year to life sentence is cruel and unusual because it is effectively life without parole. The trial court imposed 25 years to life for the first degree murder, doubled as a second strike, plus 25 years to life for a gun enhancement. (See § 12022.53.)

Diaz was 37 when he murdered Garcia. He was mature, had an extensive criminal record, and he was willing to shoot a young man to death, apparently only for cash. When one gun misfired, without second thoughts Diaz drew another and murdered Garcia face to face, at close range. Arming yourself with two guns to ensure you accomplish murder shows unusual and cold-blooded preparation. The execution was unhesitating and remorseless.

Diaz's argument collides with a solid wall of contrary precedent. (See *In re Williams* (2020) 57 Cal.App.5th 427, 437–439 [life sentence not cruel and unusual punishment when imposed on 21 year old convicted of first degree murder]; *People v. Edwards* (2019) 34 Cal.App.5th 183, 190–192 [95 year sentence for violent sexual assaults and robbery by a 19 year old was constitutional]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [life sentence imposed on 18 year old for first degree murder not cruel and unusual under federal and state Constitutions].)

19

## F

Diaz maintains the trial court abused its discretion in failing to strike his prior 2005 conviction for robbery. Our standard of review is deferential, as Diaz concedes. Diaz had "an extensive criminal history," which included "sustained juvenile petitions for assault, vehicle theft, receiving stolen property, and [grand theft]. He has also incurred adult convictions for narcotics, burglary, hit and run, theft, possession of a firearm and driving a vehicle without a valid license." The court reviewed Diaz's record and concluded that, from the time he was a juvenile through to his murder of Garcia, "the defendant has continuously suffered convictions." The court did not abuse its discretion.

## G

Diaz argues that, at sentencing, no one involved knew about two new and significant developments affecting sentencing: the Supreme Court decision in *Tirado* and SB 81.

Diaz's attorney filed her sentencing brief on February 22, 2022. The brief did not mention SB 81 or *Tirado*.

The prosecution did not file a sentencing brief.

At the sentencing hearing on March 8, 2022, the prosecutor told the court, "I will admit that I am not the best at sentencing . . . ." The court stated "25 years to life times two . . . plus the 12022.53 would make 75 years to life. The court at that point would stay the 12022.5 as well as the 667(c) and just make it a straight 75 years to life." The prosecutor said, "Understood." Diaz's counsel stated her constitutional opposition to the sentence. The court responded the punishment was constitutional. The court stated it would stay the "12022.5 allegation of five years, so that's imposed and stayed." The court also stayed the section 667(a)(1) allegation.

20

At no point was there any mention of SB 81 or *Tirado*. Each development had become effective about two months before Diaz's sentencing. Both new developments were potentially pertinent to the sentencing, as we explain.

SB 81 amended section 1385 to add subdivision (c), which has courts dismiss enhancements if doing so would further justice and is not prohibited.

*Tirado* held that the gun enhancement statute that added 25 years to life to Diaz's term gave trial courts the discretion to impose lesser uncharged enhancements of either 10 or 20 years. (*Tirado*, *supra*, 12 Cal.5th at pp. 694–702.)

The record offers no sign that the trial court was aware of these new legal developments. No party alerted the court to them.

On appeal, the prosecution asserts "it must be presumed" the court had "full knowledge of Senate Bill 81." It likewise claims the trial court was knowledgeable about the discretion granted to it by the decision in *Tirado*.

The obvious reading of the record is that the busy actors in this case had not yet learned of the new developments.

Both developments—SB 81 as well as *Tirado*—resulted from efforts by the California Legislature to adjust criminal sentencing in light of evolving public standards about appropriate incarceration. The relevant statutes were acts of legislative mercy and policy measures addressing the costs of incarceration. (See *Tirado, supra*, 12 Cal.5th at pp. 701–702.) A reasonable concomitant of legislative intent would be a concern for judicial awareness of these fresh developments.

## DISPOSITION

We remand the case to the trial court for the limited purpose of evaluating the proper application of SB 81 and *Tirado*, if any, to this case.  In all other respects, we affirm.


WILEY, J.


We concur:


STRATTON, P. J.


GRIMES, J.